IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHARLES D. WILLIAMS | § | |
| | § | |
| VS. | § | NO. A-17-CV-689-DAE |
| | § | |
| TEXAS FACILITIES COMMISSION | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO: THE HONORABLE DAVID EZRA
UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's Motion for Summary Judgment (Dkt. No. 16); Williams' Response (Dkt. No. 17); and Defendant's Reply (Dkt. No. 22). The District Court referred the Motion to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules.

This is a race discrimination and retaliation case. Plaintiff Charles Williams, who is African American, sues his former employer, the Texas Facilities Commission, pursuant to Title VII. The Texas Facilities Commission now moves for summary judgment on all of Williams' claims.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions

of [the record] which it believes demonstrate the absence of a genuine issue of material fact.' " *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325. "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). "Once the moving party [meets its initial burden], the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536. In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

## I. FACTUAL BACKGROUND

The following facts are based on the summary judgment evidence, viewed in the light most favorable to Williams. Williams worked as an HVAC technician for the Texas Facilities Commission in for 5 years prior to his termination on July 25, 2016. In 2013, an incident occurred

where Williams' supervisor, Jaime Barrington, attempted to terminate Williams from his position in the TFC downtown warehouse. Williams asserted that he had complained about race discrimination prior to the termination, and ultimately, after an internal investigation finding incidents of race discrimination, the termination was rescinded. The TFC found that a co-worker, Danny Simms, created a hostile work environment for Williams and another employee, Orlando Medrano, who is Hispanic, through his use of racial slurs, such as "boy." Simms received a written reprimand for his actions, and a six month period of probation. Simms served out his period of probation at the downtown warehouse. Williams was moved to another location in North Austin. Simms quit the TFC in October 2013 for another job.

In June 2015, Williams returned to the downtown warehouse location. Will Jones supervised Williams in a temporary capacity, as the position directly above Williams was vacant. In August 2015, Williams learned that the TFC was planning on hiring Simms to fill the vacant supervisor position directly over him and Medrano. Williams and Medrano complained to Will Jones about Simms being rehired and acting as their supervisor. Jones arranged a meeting with Williams, Catherine Camp, the TFC's HR Director, and Jones' supervisor Terri Rodgers. Williams stated at the meeting that he could not work for Simms. The parties dispute how it was communicated to Williams, but ultimately Simms was rehired and Williams was transferred to the Texas School for the Deaf, effective September 14, 2015. Dkt. No. 17-5 at 7. As Williams departed his position in the downtown warehouse, Jones prepared a performance review, dated September 11, 2015. The review was mixed, and indicated that Williams needed "a general attitude adjustment." *Id.* at 8-10. Though Williams initialed the review, he stated that he did so "under stress." *Id.* at 10.

Williams' new position at the Texas School for the Deaf was "HVAC Tech III Lead." *Id.* at 7. Williams asserts that this was technically a promotion, but he did not receive a salary increase when he was transferred. The parties dispute whether Williams refused to function as a Lead due to the lack of increased salary, and whether this was a lateral move. Williams maintains that after his transfer to TSD, he continued to contact the TFC's HR department complaining about the decision to rehire Simms and transfer Williams. In February of 2016, Catherine Camp, the TFC's HR Director, asked Williams to put his complaints about Simms in writing, which Williams did on February 8, 2016. Williams alleges that Camp informed him that his complaint was made too late, despite his earlier oral complaints.

Nick Sultemeier was Williams' supervisor at TSD. On February 15, 2016, Sultemeier gave Williams a positive evaluation. On July 25, 2016, Williams was terminated for "utilizing state owned property for personal use." Dkt. No. 16-1 at 47. The specific reasons given for his termination were that: (1) he removed two TSD ladders from TSD property for personal on June 23, 2016, during his lunch hour and again on June 30, 2016, returning the ladders on July 5, 2016; (2) on July 6, 2016, while on agency time and driving an agency vehicle, he stopped at Robert Madden Industries to purchase a part for personal use and again at Goodwill Industries to sell that part to an acquaintance; (3) he improperly parked his personal trailer on TSD property for a number of weeks and was asked to remove the trailer on July 20, 2016; and (4) his Outside Employment Notification Form did not indicate that he was performing work outside the agency. Dkt. No. 16-1 at 46. The termination notice also contained a list of "previous discussions or disciplinary actions taken" including various instances of tardiness, absenteeism, sleeping after his authorized break time or

extending his break time, and socializing at the warehouse across the street instead of attending a TFC luncheon. *Id.*

Williams filed a complaint with the EEOC alleging he was improperly terminated because of his race and in retaliation for his prior complaints. Dkt. No. 16-1 at 92. He thereafter filed this lawsuit, alleging race discrimination and retaliation.

### III. ANALYSIS

**A.   Failure to Exhaust Administrative Remedies**

The TFC first asserts that any events that occurred more than 300 days prior to the day Williams filed his EEOC Charge, April 10, 2017, are barred for failure to exhaust. Williams responds that he only seeks recovery for damages associated with his July 25, 2016, termination, and is not seeking damages for actions before that, including the 2015 transfer, and the 2013 aborted termination.[1]

**B.   Direct Evidence of Race Discrimination**

A plaintiff may prove discrimination with either direct or circumstantial evidence. *Enguita v. Neoplan USA Corp.*, 2005 WL 3279280, at *3 (S.D. Tex. 2005) (citing *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996) ). When a plaintiff relies on circumstantial evidence to prove his claim, the court analyzes the claim at the summary judgment stage under to the well known *McDonnell Douglas* burden shifting rubric. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). If there is direct evidence of discrimination, however, that rubric is not applicable. Direct evidence of discrimination "includes any statement or written document showing a

---

[1] This does not mean that these events are not relevant or admissible at any trial in this case, only that Williams may not recover damages caused by these events, but instead may only recover damages caused by his termination.

5

discriminatory motive on its face." *Portis v. First Nat. Bank of New Albany.*, 34 F.3d 325, 329 (5th Cir. 1994). Williams contends he has direct evidence of discrimination. He points to his own testimony that coworker Ken Knoblett told him in May of 2016 that Sultemeier asked Knoblett to falsify documents to "get rid of that nigger" and that Sultemeier would then give Knoblett Williams' position. As evidence of this, Williams offers his declaration, Dkt. No. 17-2 at 4, and deposition testimony. Dkt. No. 17-3 at 19-20.

If these alleged statements by Sultemeier were admissible, they would obviously amount to direct evidence of discrimination. The problem is that Knoblett did not testify that Sultemeier made the statements (in fact he denied it[2]), so the only summary judgment evidence of the statements is *Williams'* testimony that Knoblett told him that Sultemeier made the statements. This is hearsay within hearsay, is thus inadmissible and cannot be considered direct evidence of discrimination. *See, e.g., Mengele v. AT&T Servs. Inc.,* 2017 WL 3835871, at *3 (N.D. Tex. Aug. 9, 2017) (testimony that other employees told witness that a supervisor intended to target African-American employees and "we Africans must go" was hearsay and could not be considered as direct evidence of discrimination); *Knox v. City of Monroe*, 2009 WL 57115, at *6-*7 (W.D. La. 2009) (rejecting as direct evidence of discrimination several hearsay statements, including the white plaintiff's "testimony that 'several people' talked about [supervisor's] alleged plan to move [a black employee] into [plaintiff's] position"); *Lall v. Perot Sys. Corp.*, 2004 WL 884438, at *9 (N.D. Tex. Apr. 23, 2004) (statements by other employees that employer "was engaging in a pattern of systematically terminating older workers . . . constitute[d] inadmissible hearsay that the Court cannot consider as

---

[2]Dkt. No. 62-2 at 20 (Knoblett depo.).

competent summary judgment evidence"). The Court therefore must analyze the summary judgment evidence under the *McDonnell Douglas* framework.

**C.      Application of *McDonnell Douglas* to Race Discrimination Claim**

Under the *McDonnell Douglas* burden-shifting approach, Williams first has the burden to establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *Rachid*, 376 F.3d at 312. If Williams establishes a *prima facie* case, then the burden shifts to the TFC to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the TFC does so, the burden returns to Williams to show that the TFC's "stated reason is pretextual and that the true reason is unlawful discrimination." *Id.; Gerdin v. CEVA Freight, L.L.C.*, 908 F. Supp. 2d 821, 827 (S.D. Tex. 2012).

1.      *Prima Facie* Case

To establish a *prima facie* case of race discrimination, Williams must show that he: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside of the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably." *Standley v. Rogers*, 680 F. App'x 326, 327 (5th Cir. 2017) (quoting *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004) ).

The first three elements of Williams' *prima facie* case are not disputed. He is African-American, was qualified for his position, and was terminated. Though the parties spend very little time addressing it, the record is also undisputed that Knoblett replaced Williams, and that Knoblett

is white. Dkt. No. 17-3 at 61.[3] This is enough to demonstrate a *prima facie* case of race discrimination.

2.  **Nondiscriminatory Reason**

The burden therefore shifts to the TFC to articulate a legitimate non-discriminatory reason for firing Williams. *McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir. 2007). The TFC points to all of the reasons set forth in Williams' termination paperwork as its legitimate non-discriminatory reasons for terminating him. Again, this is enough to meet the TFC's burden at this step of the analysis.

3.  **Pretext**

The burden is therefore back on Williams to at least raise a genuine issue of material fact as to whether the TFC's proffered reasons were true, or rather were merely a pretext for discrimination. "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citing *Wallace v. Methodist Hospital System*, 271 F.3d 212, 219 (5th Cir. 2001). One way to establish pretext is to show that an employer failed to follow its own policies and procedures, did not discipline other employees who committed similar misconduct, or failed to document the termination process. *See, e.g., Smith v. Xerox Corp.*, 371 F. App'x 514, 520 (5th Cir.

---

[3]The specific testimony from Sultemeier was:

Q.   And after Mr. Williams left, was terminated, Mr. Knoblett got the HVAC III, correct?

A.   It was quite a while after.

Q.   He's the first person to get the HVAC III after Mr. Williams was terminated, correct?

A.   Yes.

8

2010) (failure to follow company policies); *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (failure to discipline other similarly situated employees); *Laxton,*, 333 F.3d at 580 (failure to document the termination process). The record is replete with evidence that creates fact issues as to whether the reasons the TFC claims it terminated Williams are credible.

The primary reason given for Williams' termination was unauthorized personal use of State property. The specific instances noted on Williams' Progressive Disciplinary Action Form were that: (1) he removed two TSD ladders from TSD property for personal use on June 23, 2016, during his lunch hour and again on June 30, 2016, returning the ladders on July 5, 2016; (2) on July 6, 2016, while on agency time and driving an agency vehicle, he stopped at Robert Madden Industries to purchase a part for personal use and again at Goodwill Industries to sell that part to an acquaintance; (3) he improperly parked his personal trailer on TSD property for a number of weeks and was asked to remove the trailer on July 20, 2016; and (4) his Outside Employment Notification Form did not indicate that he was performing work outside the agency. Dkt. No. 16-1 at 46.

The alleged "last straw" the led to Williams' termination was his taking ladders off TSD property during his lunch break, and using them for personal use. But there is a serious question regarding whether the ladders were State property, or Williams' property. Apparently, the only evidence that the ladders were the TFC's is hearsay testimony of two painters. Dkt. No. 17-4 at 4. The TFC policy requires that all equipment be marked, and the ladders were not marked. Additionally, Williams points out that while this incident was identified as the breaking point for his termination, he was terminated more than a month after the incident is alleged to have occurred. And the TFC's summary judgment evidence fails to demonstrate that it owned the ladders. Dkt. Nos. 17-3 at 70 (Camp admitting that HR investigation did not develop evidence that State owned

9

the ladders); 17-4 at 4 (TFC corporate rep. admitting TFC has no documentation to show State owned the ladders). Moreover, the TFC's corporate representative conceded that if the ladders belonged to Williams there would obviously have been no violation of TFC policy for Williams to use them or take them off the property. Dkt. No. 17-4 at 41.

Williams also notes the evidence that various TSD employees used TFC equipment for personal use. Sultemeier confirmed this, testifying that "[d]uring breaks and lunches the guys would work on what I would call special projects, home stuff. They'd bring stuff from home and work on it there and mainly bring their own tools, but sometimes I have seen them use State tools. . . . Pretty much everybody in the shop." Dkt. No. 17-3 at 48 (Sultemeier depo.) ("Q. Have they used tools in the shop for home projects? A. Yes."). Sultemeier further testified that he was aware that Knoblett worked on a personal icemaker on TSD property and made firepits out of used washing machine parts. *Id.* Sultemeier admitted that Knoblett gave one firepit to him and another to Williams, who helped Knoblett build it. *Id.* at 49; at 62. Neither Knoblett nor Williams was disciplined for this behavior. *Id.* at 63.

With regard to storing personal equipment on TSD property, Williams asserts that Knoblett stored his personal welding equipment on the campus. Knoblett testified that he brought his welding equipment to work at the TSD property. "The welder was mine because we didn't have a welder. Whenever we had a welding job, I'd bring my welder in to weld cages and stuff." Dkt. 17-3 at 79. Additionally, Sultemeier testified that he was aware that Williams was storing his trailer on the TSD campus for quite a while before he asked him to move it. "Charles had the trailer there for, I think, longer than 60 days. I don't remember exactly how long, but it was there quite a long time." Dkt. No. 17-3 at 53 ("Q: And you never told him to remove it prior to him going on vacation; is that

correct? A: That is correct."). Despite this, Williams was fired, and Knoblett was promoted to Lead Tech III, Williams' position.

With regard to the incident in which it is alleged that on state time Williams made a purchase at Madden and went to Goodwill and meet a friend and sell him the item, Williams denies that the incident ever occurred. The only evidence to support the allegation is from Knoblett, who testified that he witnessed the events, and informed Sultemeier about the incident. Dkt. No. 17-3 at 81. Moreover, the first mention of this alleged incident was the termination documentation, and Williams was never confronted about it, nor was he disciplined or counseled for the incident prior to his termination.

Finally, as to Williams' Outside Employment Notification Form, Williams asserts that two other employees, Fabian Rivera and Carlos Maldanado, both had outside jobs without their forms being filled out and their outside employment pre-approved. Dkt. No. 17-5 at 4-5. Sultemeier testified that he was aware that Rivera, Maldanado and another employee named Lorenzo Lucero all had outside jobs. Dkt. No. 17-3 at 61; Sultemeier Depo. at 114-119. These jobs were not pre-approved, and these individuals were not disciplined for this behavior. Dkt. No. 17-5 at 4-5.

Williams' termination paperwork also cites a list of incidents where Williams was allegedly tardy, absent, sleeping during work hours, improperly using his cellphone, and violating directives about going to the TFC warehouse during holiday luncheons. However, the summary judgment evidence shows that, other than an e-mail in November discussing four tardies, Dkt. No. 16-1 at 25, none of these incidents were shared with Williams, and there are no incident reports signed by Williams. Dkt. No. 17-4 at 4. The TFC did not follow its own progressive discipline policy with Williams prior to his termination, requiring documentation of all progressive discipline. Dkt. No.

16-1 at 62-72. Moreover, the tardies and other attendance issues were not reflected in Williams' timesheets, which were approved by Sultemeier. Dkt. No. 17-3 at 58-60. And, in February of 2016, just five months prior to his termination, Sultemeier gave Williams a review citing him as "exceeds expectations" and "superior." Dkt. No. 17-3 at 83. This review did not mention the attendance issues or other issues mentioned in Williams' termination paperwork. Dkt. No. 17-3 at 83.

Given the numerous disputes regarding the veracity of the reasons the TFC claims supported its decision to terminate Williams, there are fact issues on the question of pretext, precluding the entry of summary judgment.

**D.     Retaliation Claim**

Williams also brings a claim for retaliation. A Title VII retaliation claim is also analyzed pursuant to *McDonnell Douglas*. *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014). Step one is the whether the plaintiff has made out a *prima facie* case for a retaliation. This requires the plaintiff to demonstrate that: (1) he engaged in protected activity; (2) he suffered an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *Id.*

The TFC asserts that Williams cannot make out any of the three elements of his *prima facie* case for retaliation. The first question is whether Williams engaged in protected activity. "Protected activity" includes "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding or hearing under Title VII." *Richards v. JRK Property Holdings*, 405 F. App'x 829, 831 (5th Cir. 2010) (quoting *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (quotation marks omitted)). "[A]n employee cannot simply complain that [ ]he received unfair or undesirable treatment." *Carter v.*

*Target Corp.*, 541 F. App'x 413, 418 (5th Cir. 2013). For an internal complaint made to a company to be a protected activity, it must clearly oppose an unlawful Title VII practice. "A vague complaint that does not reference a discriminatory employment practice does not constitute a protected activity." *Id.*

On this issue, Williams asserts that at the time he was terminated, he had been complaining for almost a full year about the TFC rehiring Simms. There is no dispute that Williams complained about the decision to rehire Simms. Dkt. 17-5 at 12. Catherine Camp sent a memo to Williams dated February 23, 2016, stating that Williams had requested a "follow-up investigation" into matters related to the rehire of Danny Simms, and that since more than 30 days had passed since Simms was rehired, Williams' request for further investigation of the decision was declined. Dkt No. 17-5 at 24. Nor is there any dispute that the reason Williams complained about Simms being hired to become Williams' supervisor is that Williams had made a complaint of racial discrimination against Simms in 2013, a complaint that was sustained and that resulted in Simms being disciplined. Williams informed Catherine Camp, Terri Rogers, and Will Jones that he could not work with Simms because of the prior discriminatory behavior—behavior, as mentioned, the TFC had documented. The TFC's response was to hire Simms and transfer Williams to TSD, which Williams also complained about. This behavior is plainly behavior that is opposing racially discriminatory actions, and is sufficient to fulfill the "protected activity" prong of a *prima facie* case of retaliation.

As already discussed, Williams' termination qualifies as an adverse employment action. With regard to the sole remaining element of causation, fact issues exist as to whether Williams was terminated for his protected activity. "The plaintiff 'need not prove that [his] protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link'

13

element." *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)). However, a plaintiff must allege facts showing that the decisionmaker was aware of the protected activity; otherwise, there can be no causal connection between the protected activity and any adverse employment action taken by that decisionmaker. *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999); *see also Corley v. Jackson Police Dep't*, 639 F.2d 1296, 1300 (5th Cir. 1981). In this case, it is undisputed that decisionmakers—Nick Sultemeier, Catherine Camp and Terri Rodgers—were all aware of Williams' prior complaints about Simms. Dkt. No. 17-6 at 3. Though this is not an overwhelmingly strong causation case, it is enough to create a fact question precluding summary judgment.

With regard to the remaining elements of the *McDonnell Douglas* burden-shifting framework—the TFC's legitimate non-discriminatory reasons for terminating Williams, and Williams' evidence of pretext—the analysis of those same elements on Williams' race discrimination claim applies equally to the retaliation claim. As noted in that discussion, Williams has carried his burden of demonstrating fact questions regarding the pretext prong, and thus summary judgment is not warranted.

## III. RECOMMENDATION

Because there are genuine issues of material fact on both Williams' race discrimination and retaliation claims, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment (Dkt. No. 16) be **DENIED.**

## IV. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are

being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 1st day of July, 2019.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE